O

UNITED STATES DISTRICT COURT

DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, et al., | ) ) ) | Case No. CV 08-3315 CAS (MANx) |
| Petitioners | ) ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION |
| vs. | ) ) ) | |
| SANDRA SHEWRY, Director of Department of Health Services of the State of California, et al., | ) ) ) ) ) | |
| Respondents | ) ) ) | |

I.    **INTRODUCTION AND BACKGROUND**

On April 22, 2008, petitioners filed a verified petition for writ of mandamus in the Los Angeles County Superior Court, seeking mandamus and injunctive relief against the California Department of Health Care Services ("the Department"), Sandra Shewry, Director of the Department ("the Director"), and Does 1 through 50.[1] The

_____

[1] Petitioners are the Independent Living Center of Southern California, Inc.; Gray Panthers of Sacramento; the Gray Panthers of San Francisco; Gerald Shapiro, Pharm.D., d/b/a Uptown Pharmacy and Gift Shoppe; Sharon Steen, d/b/a Central Pharmacy; Mark Beckwith; Margaret Dowling; Tran Pharmacy, Inc., d/b/a Tran Pharmacy; and Jason
(continued...)

Department is a California agency charged with the administration of California's Medicaid program, Medi-Cal. Petitioners are health care advocates and Medi-Cal providers and recipients.

On February 16, 2008, the California Legislature enacted Assembly Bill X3 5 ("AB 5") in special session. First Amended Petition ¶ 20. Section 14 of AB 5 adds Cal. Welf. & Inst. Code § 14105.19, which reduces by ten percent payments under the Medi-Cal fee-for-service (sometimes referred to herein as "FFS") program for physicians, dentists, pharmacies, adult day health care centers, clinics, health systems, and other providers for services provided on or after July 1, 2008. Cal. Welf. & Inst. Code § 14105.19(b)(1); First Amended Petition ¶ 22. California Welfare & Institutions Code § 14105.19 also reduces payments to managed health care plans by the actuarial equivalent of the ten percent payment reduction. Cal. Welf. & Inst. Code § 14105.19(b)(3); First Amended Petition ¶ 22. Section 15 of AB 5 adds Cal. Welf. & Inst. Code § 14166.245, which reduces payments to acute care hospitals not under contract with the Department for inpatient services provided on or after July 1, 2008. Cal. Welf. & Inst. Code § 14166.245(c); First Amended Petition ¶ 23.[2] These rate and payment reductions are referred to herein as the "ten percent rate reduction."

Petitioners allege that the ten percent rate reduction violates Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. ("the Medicaid Act"), and that therefore,

---

[1](...continued)
Young.

[2] The Department is authorized to contract with individual hospitals for the exclusive right to treat Medi-Cal patients. Cal. Welf. & Inst. Code § 14081; Cedars-Sinai Med. Ctr. v. Shewry, 137 Cal. App. 4th 964, 969-70 (2006). Contracting hospitals are reimbursed by the Department at the negotiated contract rate, and once the Department has contracted with enough hospitals to meet the needs of Medi-Cal beneficiaries in a geographic area, it awards no further contracts in that area. Cedars-Sinai, 137 Cal. App. 4th at 970. Noncontract hospitals are only reimbursed for treating Medi-Cal patients under certain circumstances, including where emergency care or services are provided. Id.

it is invalid under the Supremacy Clause of the United States Constitution.  U.S. CONST. art. VI, cl. 2.[3]  Petitioners seek declaratory relief and injunctive relief to restrain the implementation and enforcement of the ten percent rate reduction.

On May 19, 2008, respondents removed this action to this Court, based on federal question jurisdiction.  On May 28, 2008, petitioners filed the operative first amended petition against the Department and the Director, alleging that Cal. Welf. & Inst. Code § 14105.19(a),(b)(1)-(2) and Cal. Welf. & Inst. Code § 14166.245 are preempted by the

---

[3] Lawsuits challenging AB 5 have also been filed in two California state courts; preliminary relief has been denied in both those cases.  In Farmacia Remedios, Inc. et al. v. Shewry et al., Case No. 08-0001274 (Cal. Super Ct. (Sacramento County) 2008), the Sacramento County Superior Court denied the plaintiff-pharmacy providers' application for an order temporarily restraining implementation of the ten percent rate reduction as it applies to pharmacies.  The court found that the plaintiffs failed to demonstrate a likelihood of success on the merits because they did not show that the Department is required to "obtain prior Federal approval of an amendment to the State Plan before implementing the ten percent rate reduction, or that failure to obtain such approval would render the rate reduction invalid as a matter of state law."  Respondent's Notice of Lodging of Declaration of Keven Gorospe, Ex. 1 (Transcript in Farmacia Remedios, Inc.) at 3-4.  Further, with respect to the issue of irreparable harm, the court found that the evidence submitted by the plaintiffs was "speculative and incomplete."  Id. at 4.  Subsequently, in California Medical Ass'n et al. v. Sandra Shewry, et al., Case No. BC390126 (Cal. Super. Ct. (L.A. County) 2008), the Los Angeles County Superior Court denied the petitioners', who are groups representing Medi-Cal service providers, motion for preliminary injunction.  The court found that the "[p]etitioners ha[d] presented a substantial showing of actual harm which will likely occur as consequences of the reimbursement reductions."  Petitioners' Notice of Lodging of Los Angeles County Superior Court Order, Ex. 1 (July 29, 2008 Order in California Medical Ass'n) at 28.  However, the court denied the motion for preliminary injunction because the petitioners had not demonstrated any probability of success on the merits, finding that the ten percent payment reduction does not violate the California Constitution and that because neither the petitioners nor Medi-Cal beneficiaries have rights enforceable under § 30(A), they are not entitled to a writ of mandate under California law.  Id. at 21, 28.  While mindful of these rulings, petitioners in this case have established on the record presented a likelihood of success on their claims that AB 5 conflicts with § 30(A), and have shown for the reasons stated below that irreparable harm will be caused by the implementation of AB 5.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Supremacy Clause and by the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12132 et seq. ("the ADA").[4]

On May 30, 2008, petitioners filed a motion for preliminary injunction. A hearing was held on that motion on June 23, 2008. By order dated June 25, 2008, the Court denied the motion for preliminary injunction finding that in light of Sanchez v. Johnson, 416 F.3d 1051 (9th Cir. 2005), petitioners could not challenge AB 5 under the Supremacy Clause, and that therefore, their probability of success on the claims was low, if not wholly lacking.

Petitioners appealed to the Ninth Circuit. By order dated July 11, 2008, the Ninth Circuit vacated this Court's June 25, 2008 order, finding that petitioners could bring suit "under the Supremacy Clause to enjoin implementation of a state law allegedly preempted by federal statute." Ninth Circuit's July 11, 2008 Order at 1-2. The Ninth Circuit also concluded that "[petitioners] have demonstrated a high likelihood that the State's ten percent reduction in payments to Medi-Cal providers will cause serious irreparable injury to Medi-Cal beneficiaries while this case is pending, at least with regard to prescription drugs." Id. at 4. The Ninth Circuit remanded the action to this Court for a decision on the motion for preliminary injunction.

Upon remand, the Court ordered further briefing on this matter. On July 25, 2008, petitioners filed their supplemental memorandum and declarations in support of preliminary injunction. Respondent filed her opposition thereto, with accompanying declarations, on July 30, 2008. On July 31, 2008, petitioners filed their reply.[5] A

---

[4] On June 1, 2008, petitioners voluntarily dismissed the Department as a respondent in this case without prejudice. On August 3, 2008, petitioners voluntarily dismissed their third and fourth claims for relief without prejudice, which claims allege preemption of AB 5 by the ADA and violation of the ADA, respectively.

[5] Both parties have challenged the admissibility of the evidence submitted by the
(continued...)

4

1   hearing was held on the motion for preliminary injunction August 1, 2008.  After

2   carefully considering the parties' arguments, the Court finds and concludes as follows.

3   **II.    LEGAL STANDARD**

4            A preliminary injunction is appropriate when the moving party shows either (1) a

5   combination of probable success on the merits and the possibility of irreparable harm,

6   or (2) the existence of serious questions going to the merits and that the balance of

7   hardships tips sharply in the moving party's favor.  See Rodeo Collection, Ltd. v. West

8   Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).  These are not two distinct tests, but

9   rather "the opposite ends of a single 'continuum in which the required showing of harm

10  varies inversely with the required showing of meritoriousness.'"  Id.  A "serious

11  question" is one on which the movant "has a fair chance of success on the merits."

12  Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).

13

14  **III.   DISCUSSION**

15

16  _____

17           [5](...continued)

    other side.  However, this Court may consider inadmissible evidence on a motion for
18  preliminary injunction, giving such evidence appropriate weight depending on the
    competence, personal knowledge, and credibility of the declarants.  11A Charles A.
19  Wright, Arthur K. Miller, & Mary K. Kane, Federal Practice and Procedure § 2949 at 216-
20  17 (2d ed. 1995); see also Ross-Whitney Corp. v. Smith Kline & French Laboratories, 207
    F.2d 190, 198 (9th Cir. 1953) (stating that preliminary injunction may be granted on
21  affidavits); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The
    urgency of obtaining a preliminary injunction necessitates a prompt determination and
22  makes it difficult to obtain affidavits from persons who would be competent to testify at
23  trial.  The trial court may give even inadmissible evidence some weight, when to do so
    serves the purpose of preventing irreparable harm."); Republic of Philippines v. Marcos,
24  862 F.2d 1355, 1363-64 (9th Cir. 1988); Seuss Ents. v. Penguin Books USA, Inc., 924 F.
25  Supp. 1559, 1562 (S.D. Cal. 1996) ("Such evidence may yet be considered by the court,
    which has discretion to weigh the evidence as required to reflect its reliability.").  The
26  Court therefore denies the parties' various motions to strike as moot for present purposes,
27  and exercises its discretion to consider the proffered evidence as appropriate.

28

## A.    LIKELIHOOD OF SUCCESS ON THE MERITS

Pursuant to the Ninth Circuit's mandate, petitioners may pursue a claim for relief under the Supremacy Clause based on the allegation that AB 5 is preempted by § 30(A) of the Medicaid Act (referred to herein as "§ 30(A)").  Here, petitioners' Supremacy Clause claim is predicated upon federal conflict preemption.  Under general principles of federal preemption, state law is preempted only to the extent that it actually conflicts with federal law.  Pacific Gas & Elec. Co. v. State Energy Comm'n, 461 U.S. 190, 204 (1983).  Such a conflict may arise either where "compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. at 203-04 (citations omitted).

Thus, to prevail on the merits petitioners will have to prove either that it is not possible for the Department to comply with both AB 5 and the Medicaid Act or that AB 5 stands as an obstacle to the enforcement of § 30(A).  As such, the Court turns to the statutory provisions at issue here.

The "quality of care" provision of § (30)(A) provides that

[a] State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care.

42 U.S.C. § 1396a(30)(A).  The "equal access" provision of § 30(A) provides that

[a] State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are . . . sufficient to enlist enough providers so that care and

services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area. Id.

Respondent urges that § 30(A) does not compel either the California Legislature or the Department to conduct any studies or to consider provider costs or any other statutory factors prior to making rate adjustments. In so arguing, respondent relies largely on Sanchez v. Johnson, 416 F.3d 1051 (9th Cir. 2005), which she contends effectively overruled Orthopaedic Hospital v. Belshe, 103 F.3d 1491 (9th Cir 1997) ("Orthopaedic II/III").[6]

In Orthopaedic Hospital v. Kizer, 1992 WL 345652 (C.D. Cal. 1992) ("Orthopaedic I"), plaintiff-hospital providers filed suit pursuant to 42 U.S.C. § 1983 ("§ 1983"), claiming that the Director violated § 30(A) by setting reimbursement rates for hospital outpatient services without considering the effect of hospital costs on efficiency, economy, and quality of care.[7] Id. at *1. The district court concluded that § 30(A) was enforceable in a § 1983 action, and that the Department "had a judicially enforceable obligation" to consider and make findings each time it modified reimbursement rates. Id. at *2. According to the district court, § 30(A) obligated the Department to consider efficiency, economy, and quality of care, which it referred to as the "relevant factors." Id. at *4. The district court found that the Director had acted arbitrarily and capriciously in establishing six of the seven challenged rates. Id. The court then remanded the matter to the Department for further consideration. Id. at *14. Upon remand, the Department conducted a rate study, and readopted the reimbursement rates without change. Orthopaedic Hospital II/III, 103 F.3d at 1495.

---

[6] Respondent also argues that Orthopaedic Hospital was incorrectly decided. However, that is an argument to be raised before the Ninth Circuit, not this Court.

[7] The hospitals did not, however, challenge the rates under the "equal access" provision. Orthopaedic I, 1992 WL 345652 at *14 n.4.

The hospitals returned to the district court, filing two lawsuits (Orthopaedic II/III) that the district court consolidated, arguing that the adopted rates did not comply with § 30(A).  Id.  The district court entered judgment in favor of the Department, finding that the Department was not statutorily required to consider hospital costs when setting reimbursement rates.  Id.  The hospitals appealed, and the Ninth Circuit reversed.  The Ninth Circuit's interpretation held that § 30(A) "provides that payments for services must be consistent with efficiency, economy, and quality of care, and that those *payments* must be sufficient to enlist enough providers to provide access to Medicaid recipients."  Id. at 1496 (emphasis in original).  The Ninth Circuit therefore concluded that under § 30(A)

> the Director must set hospital outpatient reimbursement rates that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs.  To do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting.

Id.[8]  Further, the Ninth Circuit found that "[i]t is not justifiable for the Department to reimburse providers substantially less than their costs for purely budgetary reasons."

---

[8] See e.g., Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs., 424 F.3d 931, 940-41 (9th Cir. 2005); see also Arkansas Med. Soc'y v. Reynolds, 6 F.3d 519, 530 (8th Cir. 1993) ("We agree with the trial court's conclusion that the relevant factors that DHS is obliged to consider in its rate-making decisions are the factors outlined in 42 U.S.C. § 1396a(a)(30)(A)."); cf. Methodist Hosps. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996) (finding that § 30(A) does not require a state to consider any particular factors, but rather, requires that the state arrive at substantive results consistent with the Medicaid Act); Rite Aid, Inc. v. Houstoun, 171 F.3d 842 (3d Cir. 1999) (same).

1   Id. at 1499 n.3.[9]

2          Whatever else its effect may have been, it is clear that Sanchez left undisturbed

3   the rule announced in Orthopaedic Hospital that § 30(A) creates duties on behalf of the

4   Department, i.e., the duty to consider efficiency, economy, and quality of care when

5   establishing reimbursement rates.  Indeed, the Sanchez court recognized that "[§ 30(A)]

6   speaks . . . of the *State's obligation* to develop 'methods and procedures' for providing

7   services generally."  Sanchez, 416 F.3d at 1059 (emphasis added).

8          Because Orthopaedic Hospital is binding authority on this Court, the Court finds

9   that when the State of California seeks to modify reimbursement rates for health care

10  services provided under the Medi-Cal program, it must consider efficiency, economy,

11  quality of care, and equality of access, as well as the effect of providers' costs on those

12  relevant statutory factors.

13         The Court now turns to AB 5.  Section 14 of AB 5 adds Cal. Welf. & Inst. Code §

14  14105.19, which directs the Director to reduce by ten percent payments under the Medi-

15  Cal fee-for-service program for physicians, dentists, pharmacies, adult day health care

16  centers, clinics, health systems, and other providers for services provided on or after

17  July 1, 2008, and which directs the Director to reduce by "actuarial equivalent" the ten

18  percent rate reduction to managed health care plans that contract with the Department

19  on or after July 1, 2008.  Cal. Welf. & Inst. Code § 14105.19(b)(1), (3).  Section 15 of

20  AB 5 adds Cal. Welf. & Inst. Code § 14166.245, which reduces payments to acute care

21  hospitals not under contract with the Department for inpatient services provided on or

22  after July 1, 2008.  Cal. Welf. & Inst. Code § 14166.245(c).

---

23

24         [9] Subsequently, in Sanchez v. Johnson, 416 F.3d supra at 1060, the Ninth Circuit

25  held that § 30(A) does not confer individual rights that are enforceable under 42 U.S.C. §

26  1983.  Id. at 1060.  However, in light of the mandate of the Ninth Circuit, the Court

27  assumes that petitioners herein have standing because they bring suit to enjoin enforcement
    of a state law that is claimed to be preempted by federal law.

28

Respondent has not proffered any evidence showing that the Department considered any of the "relevant factors," in making the ten percent rate reduction challenged here.[10]  AB 5 itself suggests that the only reason for imposing the cuts was California's current fiscal emergency.  See AB 5, §§ 16-17 ("This act addresses the fiscal emergency declared by the Governor . . . . This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution.").  Indeed, at the hearing held on the instant motion, respondent's counsel argued that neither the Legislature, nor the Department has a duty to consider any particular factors or to conduct any particular studies.  Therefore, based on the present record, it does not appear that respondent made the required inquiries in deciding to enact the ten percent rate reduction.

Further, the Court finds respondent's argument that AB 5 does not conflict with the State's obligations under § 30(A) because the Legislature, not the Department, made the decision to cut reimbursement rates, to be unavailing.  It is clear that the Department will, and in fact has, enforced AB 5.  Therefore, the Department has reduced payments to health care providers without regard to the statutory factors discussed supra.

---

[10] In her supplemental opposition, respondent argues that

Petitioners' proffered documents show that the Legislature did consider [the relevant] factors.  The Legislative Analyst's Office (LAO) Report shows that the Legislature was presented with and considered the possible effects of AB 5 on Medi-Cal program participants.

Respondent's Supplemental Opp'n at 13 (citing Petitioners' Decl. No. 63, Declaration of Jan S. Raymond, Ex. B (Legislative Analyst's report) at 37).  However, all the Legislative Analyst's report shows is that such a report was prepared.  Respondent has not shown that the Legislature ever reviewed or considered the concerns raised therein.  Further, respondent has repeatedly argued that the State does not have any obligation to consider any of the statutory factors addressed herein, and that the Department does not conduct any studies in this regard.

Based on the foregoing, the Court concludes that petitioners have shown a likelihood of success on the merits.

## B.   IRREPARABLE HARM

The next question before this Court is whether petitioners have shown that Medi-Cal beneficiaries will be irreparably harmed if the ten percent rate reduction is permitted to go into effect.  The Court therefore turns to the provision of medical services by the various provider groups at issue herein.

### 1.   Pharmacists

First, the Court considers whether petitioners have shown that reducing pharmacy providers' reimbursement rates will harm Medi-Cal beneficiaries.

The Ninth Circuit's July 11, 2008 order appears to mandate the conclusion that petitioners have satisfied their burden in this regard.  See Ninth Circuit's July 11, 2008 Order at 4 ("Appellants have demonstrated a high likelihood that the State's ten percent reduction in payments to Medi-Cal providers will cause serious irreparable injury to Medi-Cal beneficiaries while this case is pending, at least with regard to access to prescription drugs.").

Even if review of this issue were not foreclosed by the Ninth Circuit's July 11, 2008 order, the record before this Court demonstrates that the ten percent rate reduction will cause irreparable harm to Medi-Cal beneficiaries as to prescription drugs by reducing access to pharmacists' services.

There are two primary components relating to the provision of prescription drugs: dispensing cost and drug ingredient cost.  Under the reimbursement rate in effect prior to the ten percent rate reduction, Medi-Cal reimbursed only two-thirds of the average dispensing cost for each prescription.  Petitioners' Decl. No. 66, Declaration of Lynn Rolston ("Rolston Decl.") ¶ 5.  After the ten percent rate reduction, Medi-Cal will cover only sixty percent of a pharmacy's dispensing costs.  Id.  In the past, the positive margins on drug ingredient costs offset the negative margin on ingredient

11

reimbursement. Id., Ex. A (Myers and Stauffer LC, Certified Public Accountants, Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of California, (the "Myers and Staffer Study") (Dec. 2007)) at 586.[11]

According to petitioners, the ten percent rate reduction will eliminate the ten dollar positive margin on ingredient costs observed by the Myers and Stauffer Study, and will in fact create a ten dollar loss on brand name drug ingredient costs. Petitioners' Decl. No. 68, Declaration of Stephen W. Schondelmeyer ("Schondelmeyer Decl."), Ex. A (Stephen W. Schondelmeyer, Impact of the 10 Percent Fee-for-Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies (June 3, 2008)) at 733. These brand name drugs account for sixty-six percent of Medi-Cal's prescription drug expenditures, and 27.5% of the total number of Medi-Cal prescriptions. Petitioners' Decl. No. 66, Rolston Decl., Ex. A (Myers and Stauffer Study) at 591. Petitioners have also "presented evidence that the ten percent cut would reduce payments to pharmacies to less than what it costs them to obtain and dispense 44% of the generic prescriptions they currently dispense to their patients, causing pharmacies to cease selling such drugs to Medi-Cal patients and depriving 'thousands, if not millions' of Medi-Cal beneficiaries of much-needed pharmaceuticals." Ninth Circuit's July 11, 2008 Order at 4. Generic drugs account for 72.2% of the total number of Medi-Cal prescriptions, and 33.1% of the program's prescription drug expenditure. Petitioners' Decl. No. 66, Rolston Decl., Ex. A (Myers and Stauffer Study) at 591.

Further, petitioners have presented declarations providing evidence to the effect that the ten percent rate reduction will cause independent pharmacy owners to limit the

---

[11] Specifically, Myers and Stauffer found that single-source drugs, i.e., "patented brand name" drugs, have average margins on drug ingredient costs of approximately $10, multi-source drugs without a federal upper limit ("FUL") price or California Maximum Allowable Ingredient Costs price have average positive margins of approximately $10, and multi-source drugs with a FUL price have average margins on drug ingredient costs of $13. Rolston Decl., Ex. A (Myers and Stauffer Study: Dec. 2007) at 586.

scope of the services they provide to Medi-Cal beneficiaries, by, inter alia, discontinuing the provision of at least some prescription drugs to Medi-Cal patients, turning away new Medi-Cal patients, or by laying-off pharmacy employees, and/or reducing pharmacy hours.  See e.g., Petitioners' Pharmacy Decl. No. 2, Declaration of Ali Karandish, Pharm.D. ("We are loosing [sic] money on every brand medication dispensed to Medi-Cal patients.  We have stopped taking new patients, and if the 10% cut continues we can no longer fill any brand medications to patients."); Petitioners' Pharmacy Decl. No. 3, Declaration of Pratish Mistry at 2 ("New patients have been refused services."); Petitioners' Pharmacy Decl. No. 4, Declaration of John A. Baezel R. Ph., ¶ 5 (stating that after the ten percent rate reduction went into effect, the staff notified Medi-Cal beneficiaries that the pharmacy was "planning to drop the Medi-Cal program unless the reimbursement injunction is reversed [sic]").  The evidence also shows that because "three-fourths of the community pharmacies in California derive more than 70 percent of their total revenue from prescriptions," most pharmacies will be unable to "'make up lower prices on prescriptions by sales in the rest of the store.'" Petitioners' Decl. No. 68, Schondelmeyer Decl., Ex. A (Stephen W. Schondelmeyer, Impact of the 10 Percent Fee-for-Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies (June 3, 2008)) at 729.

To challenge petitioners' evidence, respondent submits, among other things, the declaration of Kevin Goropse, who is employed as the Department's Chief of Medi-Cal Pharmacy Policy Branch.  Grospe claims that "since the ten percent rate reduction took effect on July 1, 2008, Rite Aid Pharmacy, CVS Pharmacy, Longs Pharmacy, and Wallgreens [sic] Pharmacy have continued, and will continue, to provide all Medi-Cal covered drugs, including expensive brand name drugs, to Medi-Cal beneficiaries."  Aug. 4, 2008 Declaration of Kevin Gorospe ("Gorospe Decl.") ¶ 6; see also Respondent's Decl. No. 1, July 21, 2008 Gorospe Decl. ¶ 6 ("I have not heard of any specific problems with Medi-Cal recipients being unable to find one of these chain pharmacies

13

that will provide medically necessary and approved drugs.").  However, Grospe does
not state the basis for his knowledge.  Nor does Grospe state how many of these chain
pharmacy stores exist in California, or how accessible these stores are to residents of
California.  Based on this record, and in light petitioners' showing, the Court cannot
conclude that these four chain pharmacies will be able to compensate for the probable
adverse effect on beneficiaries' access to pharmacies if the ten percent rate reduction
takes effect.[12]  Indeed, the many declarations submitted by petitioners show that
independent pharmacy providers, who constitute approximately thirty-three percent of
the licensed community pharmacies in California, will be hard-hit by the ten percent rate
reduction, and may discontinue, or at least severely reduce, services to Medi-Cal
beneficiaries.  Petitioners' Decl. No. 68, Schondelmeyer Decl., Ex. A (Stephen W.
Schondelmeyer, Impact of the 10 Percent Fee-for-Service Payment Reductions on
Medi-Cal Beneficiaries and Pharmacies (June 3, 2008)) at 729.

Gorospe also states that according to T. Allen Hansen, the manager for the Myers
and Stauffer Study, on average, Medi-Cal reimburses $84.62 for prescription drugs,
while, on average, it costs a pharmacy $77.03 to acquire and dispense a drug.  After the
ten percent rate reduction, Medi-Cal will, on average, reimburse pharmacy providers
$76.16, thereby "compensat[ing] in the aggregate approximately 99 percent of provider
costs."  Respondent's Decl. No. 2, July 17, 2008 Gorospe Decl. ¶ 9.  First, as noted
above, the evidence shows that many pharmacy providers will be unable to continue
providing medications to Med-Cal patients if they lose any further Medi-Cal funding.
Second, it appears that after the ten percent rate reduction, approximately ninety, or
thirty-two percent, of the top 278 single source (patented brand name) drugs at the
National Drug Code level, will be reimbursed in an amount below a pharmacy's costs.
Petitioners' Decl. No. 68, Schondelmeyer Decl., Ex. A (Stephen W. Schondelmeyer,

[12] This is especially true for access to services in rural areas, which is already limited.

14

Impact of the 10 Percent Fee-for-Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies (June 3, 2008)) at 733.  Among the single source drugs that will be reimbursed below cost are antipyshoctic drugs, antiretroviral drugs, anticonvulsant drugs, and antineoplastic drugs.  Id.  Because these single source drugs are protected from competition by patents, there are no available generic alternatives.  There can be little or no doubt that Medi-Cal patients will be harmed if these necessary drugs are placed outside of their reach.

Based on the foregoing, the Court concludes that the ten percent rate reduction has a likelihood of reducing access to prescription drugs by, inter alia, causing pharmacies to stop, or at least limit, dispensing prescription medications to Medi-Cal beneficiaries.

>           **2.      Physicians, Dentists, Pharmacies, Adult Day Health Care Centers, Clinics, Health Systems, and Other Providers for Services**

The Court next to turns to the provision of medical services by physicians, dentists, optometrists, adult day health care centers, and other providers.

According to the California Legislative Analyst's report, the ten percent rate reduction may reduce access to providers and services.  Specifically, the report states that "FFS physician rates have not changed since the Legislature granted rate increases in the 2000-2001 budget year, though medical costs continuing to rise."  Petitioners' Decl. No. 63, Declaration of Jan S. Raymond, Ex. B (Legislative Analyst's report) at 37.  The report notes that evidence indicates that provider rates affect access to care, and also the perception of the quality of care that beneficiaries receive.  Further, "Medi-Cal reimbursements may particularly impact the participation of specialists in the program."  Id.  The report states that lack of access to primary care services may result in inappropriate use of the emergency room, and other such more expensive forms of care.  Id.  Because of these concerns, the Legislative Analyst recommended that the

Legislature reject the Governor's proposal to reduce payments for all providers, except hospitals. Id.

The Legislative Analyst's concerns and predictions related to the probable harm to access to primary care services are further confirmed by the many declarations and studies that petitioners have submitted. Declarations submitted by petitioners demonstrate that physician participation, particularly specialist participation, in Medi-Cal is presently low. See e.g., Petitioners' Decl. No. 1, Declaration of John S. Andrews ¶¶ 7-8 (stating that many doctors and dentists will not accept Medi-Cal patients); Petitioners' Decl. No. 8, Declaration of Adolfo O. Chanez ¶¶ 6-9; Petitioners' Decl. No. 13, Declaration of Robert E. Fuller ¶ 6; Petitioners' Decl. No. 50, Declaration of Donald Bancroft Moulds, Ex. C (Andrew B. Bindman, M.D. et al., Physician Participation in Medi-Cal, 2001 (May 2003)) at 1-2 (stating that many physicians are not willing to treat Medi-Cal patients). According to the California Healthcare Foundation, only forty percent of private dental practices accept Denti-Cal patients. Petitioners' Decl. No. 44, Declaration of Ronald B. Mead, Ex. B (California Healthcare Foundation, Denti-Cal Facts and Figures: A Look at California's Medicaid Dental Program (May 2007)) at 3. At least one study, entitled "Factors that Influence the Willingness of Private Primary Care Pediatricians to Accept More Medicaid Patients," shows that the willingness of primary care pediatricians to participate in Medi-Cal increases with reimbursement rates. Petitioners' Decl. No. 3, Declaration of Stephen Berman, M.D., Ex. A (Steve Berman et al., Factors that Influence the Willingness of Private Primary Care Pediatricians to Accept More Medicaid Patients, 110 PEDIATRICS 239 (Aug. 2, 2002)) at 15-16.

Physicians assert that although they will continue to treat their existing Medi-Cal patients, they will not accept new patients. See e.g., Petitioners' Decl. No. 4, Declaration of Arnold Blustein, M.D. ¶ 10; Petitioners' Decl. No. 24, Declaration of Carla Fulton Kakutani, M.D. ¶ 11; Petitioners' Decl. No. 28, Declaration of Paul

Kivena, M.D. ¶ 8 (stating that most pediatricians in his county do not accept new Medi-Cal patients); Petitioners' Decl. No. 40, Declaration of Theodore M. Mazer, M.D. ¶ 12 (stating that although he will continue to treat current Medi-Cal patients, he is currently turning away new Medi-Cal patients); Petitioners' Decl. No. 50, Declaration of Donald Bancroft Moulds, Ex. C (Andrew B. Bindman, M.D. et al., <u>Physician Participation in Medi-Cal, 2001</u> (May 2003)) at 690 (stating that fifty-five percent of primary care physicians, forty-eight percent of medical specialists, and forty-three percent of surgical specialists were accepting new Medi-Cal patients).  One dentist practicing in Santa Maria states that he is not aware of any other dental office limited to treating children from Santa Barbara County that accepts Medi-Cal patients in his geographic area. Petitioners' Decl. No. 5, Declaration of Samuel R. Burg, D.D.S. ¶ 7; <u>see also</u> Petitioners' Decl. No. 41, Declaration of Ronald B. Mead, D.D.S. ¶ 8 ("Other than my partners, I am not aware of any other oral and maxillofacial surgeons in my area who accept-Medi-Cal.").  Nonetheless, he anticipates that he will either stop treating Medi-Cal patients, or, at a minimum, will be forced to reduce the services he does provide. Petitioners' Decl. No. 5, Declaration of Samuel R. Burg, D.D.S. ¶ 10; <u>see also</u> Petitioners' Decl. No. 16, Declaration of H. William Gottschalk ¶ 11.  Other dentists claim that although they will treat their current patients, they will turn away new Medi-Cal patients.  The same is true of optometrists.  <u>See e.g.</u>, Petitioners' Decl. No. 7, Declaration of Tony Carnevali, O.D. ¶ 11.

There is also evidence to suggest that the lack of access to primary care services has increased the burden on emergency rooms and community health clinics.  <u>See e.g.</u>, Petitioners' Decl. No. 1, Declaration of John S. Andrews ¶¶ 9-11; Petitioners' Decl. No. 8, Declaration of Adolfo O. Chanez ¶ 6; Petitioners' Decl. No. 28, Declaration of Paul Kivena, M.D. ¶ 7; Petitioners' Decl. No. 32, Declaration of Gerald Kozai ¶¶ 7-8; Petitioners' Decl. No. 51, Declaration of Alan Nager, M.D. ¶ 6.  Adult day health care providers also appear to be at risk.  For instance, the Peg Taylor Center for Adult Day

Health Care is the only adult day health care program serving Butte, Tehama, and Glenn Counties.  Petitioners' Decl. No. 8, Declaration of Diane Cooper-Puckett ¶ 11.  In September 2007, it was forced to close its Orville site because it could not sustain its operations on Medi-Cal reimbursement fees.  Id. ¶ 5.  The viability of the remaining site in Butte County is now threatened by the ten percent rate reduction.  Id.  Similarly, the Ruth Ann Rosenberg Adult Day Health Center in San Francisco represents that it has not found additional resources to compensate for the loss of funds due to the ten percent rate reduction, and that if it remains unable to do so, it will be forced to close. Petitioners' Decl. No. 25, Declaration of Cindy Kauffman ¶ 11; see also Petitioners' Decl. No. 53, Declaration of Nina M. Nolcox, R.N., P.H ¶¶ 4-5 (stating that the primary adult day health care program serving South Los Angeles will likely have to close and file for bankruptcy).  This evidence is sufficient to show that the ten percent rate reduction has a likelihood of reducing Medi-Cal beneficiaries' access to medical services.[13]

### 3.  Non-Contract Hospitals

The present record does not, however, support a finding of irreparable harm with respect to the provision of medical services by non-contract hospitals.

The Legislative Analyst recommended that the Legislature accept the Governor's proposal to reduce payments to hospitals and nursing facilities.  Petitioners' Decl. No. 63, Declaration of Jan S. Raymond, Ex. B (Legislative Analyst's report) at 37.  Indeed, it appears that California raised the reimbursement rate for both inpatient and outpatient services between 2001 and 2004.  There is evidence showing that approximately ninety percent of acute care hospital inpatient services are provided by contract hospitals that

---

[13] As pointed out by counsel at the hearing held on the instant motion, petitioners are forced to rely largely on anecdotal evidence because the Department affirmatively represents that it does not have a duty to conduct studies, and that there is therefore a lack of empirical evidence in this regard.

are not subject to the ten percent rate reduction.  Respondent's Decl. No. 5, Declaration of Gary Wong, Ex. D (California Medical Assistance Commission, <u>California Medical Assistance Commission Annual Report to the Legislature</u> (2008)) at 000225-26. Further, petitioners' declarations show that acute care hospitals will continue to provide both inpatient and outpatient care, though some patients may be transferred to other more remote hospitals.  See <u>e.g.</u>, Petitioners' Decl. No. 13, Declaration of Robert E. Fuller ¶ 11.  While some acute care hospitals may be forced to stop, or at least limit, their provision of outpatient services, it appears that there are other providers in the area to take on that care.  See <u>e.g.</u>, Petitioners' Decl. No. 43, Declaration of Richard L. Mendoza ¶ 9 (stating that Pioneers Memorial Hospital chose to close two outpatient clinics because "other providers likely would be able to take on the patients that were serviced by the clinic"); Petitioners' Decl. No. 46, Declaration of Tish Miller ¶ 4 (stating that there are "two small outpatient clinics and a small physician practice" in Mariposa).  Petitioners argue that if the ten percent rate reduction goes into effect, primary care physicians may cease treating many Medi-Cal patients, and if primary care physicians cease doing so, then hospitals will likely be more burdened, and if hospitals are more burdened they will have to pay stipends to physicians to treat patients, which will in turn further impede the hospital's ability to provide sufficient patient care. However, based on the present record, this type of harm is too speculative to support a finding of irreparable harm.

In accordance with the foregoing, the Court finds that petitioners have not shown that they will be irreparably harmed if payments to non-contract hospitals are reduced.

### 4.    Managed Care Plans

Finally, the present record does not support a finding that managed care plans will "pass through" the actuarial equivalent reduction to managed care providers.  The only evidence that petitioners' have submitted in this regard is the declaration of Gilbert Simon, M.D., wherein Dr. Simon states that "[t]hree years ago, a situation occurred

19

where payments from a Medi-Cal managed care plan decreased" and that of Thu-Hang Tran, Pharm.D., wherein Tran states that the CalOptima Board of Directors voted to decrease the current rate of payment to pharmacies in the CalOptima network. Petitioners Decl. No. 73, Declaration of Gilber Simon, M.D. ¶ 11; Petitioners' Supplemental Declaration of Thu-Hang Tran, Pharm.D. ¶ 7.  However, this evidence, by itself, is insufficient to support a finding of irreparable harm.  This is especially true in light of the evidence submitted by respondent to the effect that a managed care plan is contractually obligated to provide full and complete access to medical care to all Medi-Cal recipients enrolled in the plan.  Respondent's Decl. No. 14, Declaration of Vivkie Orlich ¶¶ 3-5.  Therefore, the Court finds, with respect to the provision of medical services by managed care plans, the evidence submitted by petitioners to establish irreparable harm appears to be speculative.

### C.     BALANCE OF HARDSHIPS

The Court is mindful of the difficulty facing the State of California in light of its fiscal crisis: there is an estimated $14.2 billion budget shortfall.[14]  However, the State has accepted federal funds under the Medicaid Act.  In so doing, the State agreed to abide by the conditions imposed by Congress.  Further, retroactive relief for Medi-Cal beneficiaries will likely be inadequate and, and it will come too late, to remedy their pain, suffering, and harm to their mental and physical well-being.  See e.g., Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983).  In light of the significant threat to the health of Medi-Cal recipients, reducing payments to health-care service providers will likely cause, and given that nothing in this Court's order prevents respondent from imposing a rate reduction after she has appropriately considered and applied the

_____

[14]  The Court notes that there is evidence to suggest that if the ten percent rate reduction is given effect, many Medi-Cal beneficiaries will turn to more costly forms of medical care, such as emergency room care, thereby diminishing the State's projected savings.  See e.g., Rodde v. Bonta, 357 F.3d 988, 999 (9th Cir. 2004).

relevant factors, the Court finds that the balance of hardships tips in favor of granting the preliminary injunction.

### D.   PUBLIC INTEREST

"The district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." Hybritech, 849 F.2d at 1458.  Clearly, there is a public interest in ensuring that the State has enough money to meet its financial obligations in the face of competing demands. However, there is also a public interest in ensuring access to health care.  In light of all the circumstances, including the fact that the State may decide to implement a rate change upon making a properly reasoned and supported analysis, the Court finds that the public interest does not weigh against the issuance of a preliminary injunction.

## IV.   CONCLUSION

Because respondent has failed to demonstrate that the State of California considered whether the ten percent rate reduction would be consistent with efficiency, economy, quality of care, and equality of access, or the effect of providers' costs on Medi-Cal beneficiaries' access to medical providers and services, the Court finds that petitioners have demonstrated a likelihood of succeeding on the merits of their Supremacy Clause claim.  In light of this likelihood of success on the merits, and because it appears that if Cal. Welf. & Inst. Code § 14105.19(b)(1) is enforced Medi-Cal patients will be irreparably harmed, the Court hereby GRANTS petitioners' motion for preliminary injunction to the extent that it seeks to enjoin enforcement of Cal. Welf. & Inst. Code § 14105.19(b)(1), which reduces by ten percent payments under the Medi-Cal fee-for-service program for physicians, dentists, pharmacies, adult day health care centers, clinics, health systems, and other providers for services provided on or after July 1, 2008.  However, the Court DENIES without prejudice petitioners' motion for preliminary injunction to the extent that it seeks to enjoin implementation of Cal. Welf. & Inst. Code § 14105.19(b)(3), which reduces payments to managed care plans, and

21

Cal. Welf. & Inst. Code § 14166.245(c), which reduces payments to non-contract acute care hospitals because the present record does not substantiate petitioners' allegations that the implementation of these statutory provisions will result in irreparable harm to Medi-Cal patients or that the balance of hardships tips sharply in their favor.

The Court hereby orders respondent Director, her agents, servants, employees, attorneys, successors, and all those working in concert with her to refrain from enforcing Cal. Welf. & Inst. Code § 14105.19(b)(1), including refraining from reducing by ten percent payments under the Medi-Cal fee-for-service program for physicians, dentists, pharmacies, adult day health care centers, clinics, health systems, and other providers for services provided on or after July 1, 2008.

IT IS SO ORDERED.

Dated: August 18, 2008

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE

22