Xavier Becerra
Attorney General of California
Susan M. Carson
Supervising Deputy Attorney General
Joshua N. Sondheimer
Deputy Attorney General
State Bar No. 152000
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4420
  Fax:  (415) 703-5480
  E-mail:  Joshua.Sondheimer@doj.ca.gov
*Attorneys for Respondent, Director, California
Department of Health Care Services*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, a nonprofit corporation; et al.,**<br><br>Petitioners,<br><br>**SACRAMENTO FAMILY MEDICAL CLINICS, INC.; et al.,**<br><br>Intervenor,<br><br>**v.**<br><br>**JENNIFER KENT, Director of the Department of Health Care Services of the State of California,**<br><br>Respondent. | CV 08-03315 CAS (MANx)<br><br>**DECLARATION OF GARY GREENFIELD IN SUPPORT OF RESPONDENT'S OPPOSITIONS TO PETITIONERS' AND INTERVENORS' MOTIONS FOR DETERMINATION OF AMOUNT OF ATTORNEYS' FEES**<br><br>Date:          January 13. 2020<br>Time:          10:00 a.m.<br>Courtroom:   8D, 8th Floor<br><br>The Honorable Christina A. Snyder |

1

I, Gary Greenfield, declare:

1.    I am making this Declaration in support of the Oppositions of the Respondent to the motions for a determination of attorneys' fee awards filed by the Petitioners and certain Intervenors (Intervenors) in this action ("Motions for Fees" or "Motions").  I have personal knowledge of the matters set forth herein and, if called upon to testify, could and would competently testify thereto.

2.    I have been retained by Respondent to testify as an expert witness regarding the fees and expenses being sought by Petitioners[1] and Intervenors[2] in these actions.

3.    The Petitioners have been represented by Lynn S. Carman ("Carman") and the Law Office of Stanley L. Friedman (the "Friedman firm") in this action.  Mr. Carman's fees are not at issue on this Motion.  The Intervenors have been represented by Hooper, Lundy and Bookman, P.C. ("Hooper, Lundy") in this action and on this Motion.

## MY BACKGROUND

4.    I am the founder of Litigation Cost Management (LCM), based in Oakland, California.  LCM commenced business in 1991.  LCM is in the business of consulting regarding legal fee-related issues.  As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation with regard to the reasonableness, appropriateness and allocation of time, fees and expenses being sought, as well as hourly rates.  We also consult with clients regarding how to manage their outside litigation more effectively and efficiently.

---

[1] The Petitioner are Independent Living Center of Southern California, the Gray Panthers of Sacramento, Gray Panthers of San Francisco, Gerald Shapiro, Pharm.D. dba Uptown Pharmacy & Gift Shoppe, Sharon Steen dba Central Pharmacy, Tran Pharmacy, Inc., Mark Beckwith, Margaret Dowling and Jason Young.
[2] The moving Intervenors are the Sacramento Family Medical Clinics, Inc., Theodore M. Mazer, M.D., Ronald b. Mead, D.D.S., and Acacia Adult Day Services.

LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

5.      Prior to starting LCM in January 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981.  During my career at my former law firm, I handled general commercial litigation, from pre-filing preparation and negotiations through trials and appeals.  I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation.  I represented both plaintiffs and defendants.  I handled both contingency cases and cases where we were compensated on an hourly basis.  I graduated from the Boalt Hall School of Law in 1975 and received my undergraduate degree from Stanford University in 1971.  Attached hereto as Exhibit 1 is my Resume.

6.      Since LCM was founded, I have conducted hundreds of analyses of the legal and expert witness fees and expenses in cases of various types and sizes. These have included individual actions, multi-party suits and class actions.  The cases have included the full range of civil litigation, such as patent, copyright, trademark, real property, False Claims Act, ERISA bankruptcy, tax, breach of contract, securities, antitrust, environmental, insurance coverage and bad faith, discrimination, disability, civil rights, constitutional law, inverse condemnation, personal injury and products liability cases.  I have myself been personally involved in, conducted analysis in and supervised each of these analyses.  As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues, both on behalf of parties opposing fee applications and on behalf of law firms or clients seeking to recover their fees.

7.      I have qualified and testified previously as an expert witness in litigation regarding legal and expert witness fees in a number of cases (both litigation and

arbitrations), again both on behalf of parties seeking to recover their attorneys' fees and parties opposing requests for attorneys' fees.

8.    I was appointed a Special Master to analyze and report to the San Francisco Superior Court regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

9.    As part of my work, I also consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill analysis and auditing procedures.  I have lectured and conducted seminars for clients and law firms in each of these areas.

10.    I have taught or been a speaker at a number of programs regarding analysis of legal fees, legal bill auditing and litigation management.

11.    For purposes of my analyses in these various cases and my consulting work, we have received, and I have analyzed the time entries, billing rates and expenses billed in many hundreds of cases, involving law firms and law firm offices across the country.  I also review bills and rate information in cases beyond those I work on as an expert in litigation.  As a result, I have reviewed the billing practices and billing rates of hundreds of firms and thousands of lawyers and non-lawyers providing services across the country.  I also review databases of rates and surveys of billing rates published by legal periodicals and assembled by other legal consultants, including the Valeo Partners database, the Thomson Reuters Legal Billing Report, the Wolters Kluwer Real Rate Report, the ALM Survey of Law Firm Economics, the National Law Journal Billing Report and others.  I also regularly review cases and articles dealing with attorneys' fees, litigation management issues, and billing rates being charged in the legal industry.  As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

12.   Because of the work I have done, analyses I have undertaken in other cases, and materials and literature I regularly review in the legal fee area, I am familiar with typical, reasonable and commonly accepted billing practices among law firms, both nationally and in various parts of the United States, including in the San Francisco Bay Area, as well as with the common and normal processes used by courts in analyzing requests for fees.

## MATERIALS REVIEWED

13.   For purposes of my analysis and preparation of this Declaration, I have reviewed the original Motions for Fees filed in this action in 2015 (the "2015 Motions for Fees") and the supporting materials, the Supplemental Motions for Fees filed in 2019 and supporting materials, and a number of the filings in this action (in both the state court litigation and the federal court litigation). Throughout this Declaration, I will identify various materials filed in the case by their Docket number (i.e., "Dkt. ___") in the District Court file in this action.

## CREATION OF DATABASE

14.   As we do in most of our cases, LCM created a database of the time entries filed in support in the Motions by the Friedman firm and Hooper, Lundy.[3] A number of the Exhibits attached hereto are analyses and reports from that database.  Attached hereto for reference purposes as Appendix A are all of the time entries of the Friedman firm and of Hooper, Lundy in date order.  Attached hereto as Appendix B are all of the time entries of those two firms organized by biller.

---

[3] The process for creation of the database of the time is as follows.  We create an electronic computer file of the bills or other compilation of time and/or expense entries filed with the Motion.  The information put into the computer file typically includes the work date, the identity of the biller undertaking each task or group of tasks in the bills or time entries, the descriptions of the work undertaken, the time spent, the amount billed, as well as other information from the bills or time entries.  We then check the computer file using various analyses and tests to verify that it accurately reflects the time entries provided.  At times, we correct obvious misspellings or typographical errors.  We then create the database from the computer file.  The database in this case was created in this manner.

Attached hereto as Appendix C are all of the time entries of Mr. Carman which were filed in support of the Petitioners' Motion for Fees in 2015.[4]

# APPROACH TO ANALYSIS

15.   On its Motion, the Friedman firm is seeking a lodestar of $7,714,979.90. Declaration of Stanley L. Friedman filed in support of the Motion ("Friedman Declaration"), paragraph 4.

16.   On a motion for fees based on California Code of Civil Procedure Section 1021.5, the legal fees are determined by arriving at the "lodestar"—the reasonable time to have billed multiplied by the appropriate rates for the billers. The lodestar is not based on the amount of time billed, but the *reasonable* time, which is based on a determination of the time that was reasonable, necessary, and appropriate to bill.  In order to arrive at the reasonable time billed, there are a number of analyses I normally undertake, which include:

a.     Whether the time entries provided in support of the motion appear to accurately reflect the actual time worked and the actual work done;

b.     Whether the time entries provide reasonably sufficient information regarding the work done;

c.     Whether the work was billed at appropriate rates;

d.     Whether the time billed appeared excessive;

e.     Whether there appeared to be inappropriate time billed, such as for secretarial, clerical, administrative or other types of non-billable work;

f.     Whether the case was staffed appropriately; and

g.     Whether there were errors in the bills.[5]

---

[4] Mr. Carman's fees are not at issue on these Motions, and his time entries were not put into the database.  Appendix C is a compendium of his time entries attached to his Declaration in support of the Petitioners' 2015 Motion for Fees.

[5] All of these are areas which have been addressed in numerous court decisions regarding the reasonableness of fees being sought in cases and are also of concern to fee-paying clients who are seeking to cost-effectively manage their cases.  In cases where the clients are not paying the fees and not managing the case on an on-going basis during the case, the time entries are typically not reviewed by

17.    Virtually every one of these problem areas was found in the Friedman firm bills analyzed here.

18.    One area that needs to be addressed in terms of billing practices was the use at times of "block-billing." Block-billing is the combining of the time for multiple tasks (often for an entire day) into one time entry.  Block-billing makes it difficult, and frequently impossible, to precisely quantify the time involved in various tasks and projects.  Law firms and lawyers, particularly those that are regularly engaged in litigation where fees may be awarded, are well aware of these problems as they have been the subject of literally hundreds of judicial decisions, articles, and continuing legal education programs.  There is no precise way to quantify the tasks within block-billed entries, and I use various methods to estimate the time in analyses that involve block-billed entries.[6]

19.    Based on the conclusions reached through my analyses, frequently adjustments are made to the time or rates sought.  Sometimes these adjustments can be made on an entry-by-entry basis.  Other times, it is only practical to make percentage adjustments to the time, rates, or fees being requested.  Sometimes a combination is necessary.[7]

---

anyone outside of the law firms until the opponent who is being asked to pay the fees must analyze the time and rates being sought to assist the Court in determining the reasonable time to have billed and the appropriate rates to apply. I have been retained on behalf of the Respondent for that purpose.

[6] All of these are areas which have been addressed in numerous court decisions regarding the reasonableness of fees being sought in cases and are also of concern to fee-paying clients who are seeking to cost-effectively manage their cases.  In cases where the clients are not paying the fees and not managing the case on an on-going basis during the case, the time entries are typically not reviewed by anyone outside of the law firms until the opponent who is being asked to pay the fees must analyze the time and rates being sought to assist the Court in determining the reasonable time to have billed and the appropriate rates to apply. I have been retained on behalf of the Respondent for that purpose.

[7] I am not providing my opinion regarding what multiplier, if any, ought to be applied in this case although my opinions and conclusions may be relevant to whether a multiplier should be awarded at all.

# ANALYSIS

## I.    STAFFING

20.    An area that has a significant impact on the fees in litigation is the staffing of a case, which involves both how the case was staffed and how that staffing was managed during the course of the case.  Cost-effective management of staffing is critical to time and fees being reasonable in a case, and ineffective management will significantly drive up the fees.

21.    Attached hereto as Exhibits 2 and 3 are Biller Summaries for the Friedman firm and Hooper, Lundy showing the billers, the rates sought for each,[8] the hours billed according to the time entries and the resulting fees.

22.    One indication of the overall reasonableness of the staffing on the case is the "blended rate" (the average rate billed for each hour of the case).  An unusually high blended rate is reflective of top-heavy staffing, either in terms of the number of senior personnel working on the case or the assignment of work to billers whose rates are higher than necessary for the particular work.

23.    The blended rate on this case for the Friedman firm is $895 per hour, *i.e.*, $895 per hour is being sought for each hour of work going back to 2008, regardless of the task.  That is an extraordinarily high blended rate.[9]  In contrast, the blended rate for Hooper, Lundy is $631 per hour, see Exhibit 3 hereto, nearly $265 per hour less than that of the Friedman firm.

24.    The Friedman firm blended rate results primarily from two factors.  First, the two primary billers on the case, Mr. Friedman, who billed 6,622.80 hours, and

---

[8] The "sought rate" for the Friedman firm are based upon what it contends are the "prevailing market" rates for its billers.  The sought rates for Hooper, Lundy personnel are what Mr. Cannizzo indicates are the firm's "standard rates" actually billed its clients.  Declaration of Craig Cannizzo in Support of Motion for Attorneys' Fees ("Cannizzo Declaration"), paragraph 33.
[9] The type of case where one might see that high of a blended rate is a case where a particular lawyer is hired for his or her expertise in a narrow area, such as writing an appellate brief, but who gets a little assistance from lower-rate billers, and that lawyer bills virtually all the time.  That is not this type of case.

Mr. Bernardino, who billed 1,782.50 hours, account for 98% of both the hours billed and fees sought. See Exhibit 2 hereto. That in turn results from how the staffing was "managed," *i.e.*, the fact that they both undertook large numbers of hours for tasks that, in firms where the work was being managed appropriately, would have been delegated to and billed by lower rate billers (lawyers or paralegals).[10] That is discussed further below.

## II.   BILLING ISSUES

25.   In addition to how the case was staffed and the staffing managed, there are a number of significant billing issues that I identified in the time entries.

26.   In my analyses, I do not look for isolated examples of billing problems, but rather for patterns and practices which indicate excessive, unreasonable, or inappropriate billing.  It is impossible in the analysis of legal fees to evaluate most time entries against some objective measure since often none exists or if it does, such as a piece of correspondence or other work product, it is frequently not available to me.[11]  Moreover, while it is difficult and, in many cases, impossible to evaluate the reasonableness of the time spent on large projects simply by looking at the time entries and work product, the amount of time spent on minor projects will often provide insight into the overall attitude of the billers toward the time they are recording and therefore into the overall reasonableness of the time billed.  Thus, in my experience, where one finds billing problems with respect to small projects or activities, it reflects billing problems with larger projects as well, and, where there are repeated instances of problematic billing by a biller or firm, the logical and

---

[10]   It may be that, since the Friedman firm is not a large firm, work had to be done by whoever was available, but that does not justify having work billed at an excessive rate, as discussed in the text below.  The work that is appropriate for a more junior person should be billed at a rate appropriate for that work.

[11]   At times, one can evaluate the time billed against materials one can review in the file (which I did here), compare the time billed both participants to a telephone call or a conference (which I also did here), evaluate the time billed for a piece of correspondence or email if one has access to it (which I often do not and did not here), or look for other evidence to indicate whether the time billed for work appears appropriate and reasonable.

reasonable conclusion is that the problems permeate the biller's or firm's time entries overall.[12]

27.    An initial concern in this case is that there are a number of indications that the Friedman firm time entries are not accurate or reliable reflections of work done, and that the time billed is more than what was actually or should have reasonably been billed.  The following are examples of what I found.

28.    Mr. Friedman's time entries relating to the Motion for Preliminary Injunction (Dkt. 11), filed on May 30, 2008, appear to reflect a pattern of unreliable time entries and excessive time.

29.    A number of the Declarations filed in support of the Motion for Preliminary Injunction were by the Petitioners or representatives of the Petitioners. I will refer to these Declarations as the "Party Declarations."  A compendium of the Declarations filed in support of the Motion for Preliminary Injunction, including the Party Declarations, is attached hereto as Exhibit 4.  As indicated in Exhibit 4, other than the Declaration of Joan B. Lee discussed below, the Party Declarations were all executed on or before May 1, 2008.  However, Mr. Friedman billed for continuing to prepare or revise all of them from May 29, 2008 through June 2, 2008, nearly a month later. See Exhibit 5 hereto.

30.    For example, the Declaration of Norma Vescovo was executed on April 21, 2008. See Exhibit 4 hereto, p. 93. Mr. Friedman, however, billed "Continue Preparing Declaration of Norma Vescovo in support of Motion for Preliminary Injunction" on May 29, 2008, nearly a month and a half later.  See Exhibit 5, May 29, 2008  entry.  Similar entries were made relating to all of the Party Declarations on dates after they were executed. *Id*.

31.    There are problems with the time entries for the other Declarations filed in support of the Motion for Preliminary Injunction as well.  The Declaration of

---

[12] Sometimes billing issues are not firm-wide, but are confined to certain billers in the firm.

1   Michael Lyon was executed on April 29, 2008, see Exhibit 4 hereto, p. 86, yet Mr.

2   Friedman bills for continuing to prepare Mr. Lyon's Declaration on May 30, 2008,

3   and June 1, 2008, and for reviewing, revising, finalizing and filing it on June 2,

4   2008.  See Exhibit 5, May 30 and June 1, 2008 entries.  The Declaration of Joan B.

5   Lee was executed on May 27, 2008  (Exhibit 4 at 20), but Mr. Friedman billed on

6   May 29, 2008, two days later, for continuing to prepare it, and on June 1, 2008, two

7   days after that, for reviewing, revising, finalizing and filing it. Exhibit 5, 5/29/08

8   and 6/1/08 entries.  The Declaration of Richard Wilson was executed on May 28,

9   2008 (Exhibit 4 at 153), yet Mr. Friedman billed for continuing to prepare the

10  Declaration on May 30, 2008 and June 1, 2008, and for reviewing, revising,

11  finalizing and filing it on June 2, 2008.  Exhibit 5, 5/30/08, 6/1/08, and 6/2/08

12  entries.

13      32.   In Declarations Mr. Carman filed in 2015 relating to the 2015 Motions

14  for Fees being filed in this action at that time, Mr. Carman asserts that a number of

15  the time entries filed by Mr. Friedman in support of the Friedman firm's 2015

16  Motion for Fees were false in that, Mr. Carman asserts, Mr. Friedman did not

17  undertake the work for which he billed.  Mr. Friedman attempts to explain some of

18  the time entries Mr. Carman references, but his explanation in fact confirms their

19  problematic nature because while he states that he worked long hours on these

20  Declarations, the work he describes is not what the time entries indicate and the

21  work he describes he undertook was not appropriately billable or not billable at the

22  rate he is seeking.

23      33.   Specifically, Mr. Carman asserted, among other things, that the time

24  entries by Mr. Friedman for preparing, revising and finalizing the Party

25  Declarations on June 1, 2008 and June 2, 2008, several of the dates in question,

26  were false.  Carman Declaration (Dkt. 467), Section C, pp. 7-10.  In response to Mr.

27  Carman, Mr. Friedman does not state or demonstrate that he was revising or editing

28  the substance of the Declarations, which is what one would expect him to say, if in

11

fact that is what he was doing, since that is the impression created by the time entries themselves.  Instead he states that the time entries reflect the fact that he had "spent the entire day and night in my office … to prepare OCR versions of the declarations (as Mr. Carman had lost the Word Perfect documents), then cleaned up said Word Perfect versions and then prepared summaries and annotations of the declarations."  Friedman Declaration (Dkt. 470-1), ¶ 16.

34.    Thus, based on Mr. Friedman's explanation, it appears that he took the Declarations prepared by Mr. Carman and cleaned them up for filing and prepared summaries and annotations of the Declarations.  However, nowhere in Mr. Friedman's billing entry descriptions does it indicate that Mr. Friedman was undertaking that type of work—OCRing documents and then cleaning them up— which is secretarial in nature and therefore non-billable.[13]

35.    Nor is there any indication in the time entries that he was summarizing and annotating the Declarations, which, while it might be appropriately billable work for a paralegal or junior lawyer, is not appropriately billable by a senior lawyer seeking the rate of $899 per hour.

36.    Mr. Friedman used this description ("Review, Revise, Finalize, and file") frequently throughout his time entries (over 140 times, putting aside variations of which there were also many). See Exhibit 6.  Not only does Mr. Friedman's explanation for what he was doing when he was using these time entries call into question the other entries where he uses that description (or variations), it calls into question Mr. Friedman's overall time entry descriptions, since it indicates that one cannot be confident that his time entry descriptions accurately describe the work

---

[13] While in a broad sense, OCRing and cleaning up a document for ultimate filing could be seen as preparing and finalizing a document for filing, that is not what is generally understood as a senior lawyer's revising and finalizing a declaration.  A review of the documents indicates that some of the documents were re-typed, a few redactions made, and other minor non-substantive changes made. Others appear to have been scanned and OCRed as Mr. Friedman indicates. However, none of that is billable time other than possibly identifying the few words which were to be redacted, and many hours were billed for this work.

actually done for which he billed.  This in turn undercuts the overall reliability of his time entries as a basis for the lodestar.

37.    In an effort to minimize their importance, Mr. Friedman states that these time entries reflect a miniscule portion of the total time billed.  Friedman Declaration (Dkt. 470-1), ¶¶ 2-3.  However, as discussed above, Mr. Friedman essentially acknowledges that the time entries do not accurately describe the work done, there are many other entries that use these same descriptions, and even a few such entries raise questions about a law firm's billing practices overall.  There are numerous examples of other problematic entries as well, as the following demonstrates.

38.    Mr. Friedman's time entries reflect unreasonable time being billed.  The following are examples:

a.    35.50 hours in the entries discussed above for reviewing, revising, finalizing and filing the various Declarationswhich is clearly excessive for the type of work being done as described by Mr. Friedman (even were it appropriately billable). Exhibit 5.

b.    5.0 hours billed over three days for preparation, revision and filing of the Notice of Motion for the Preliminary Injunction (Dkt. 9), a document for which normally a few tenths of an hour might appropriately be billed, if it were billed at all. See Exhibit 7.[14]

c.    .5 hours billed on 5/27/08 for "Prepare Summons."  App. A, Friedman 5/27/08 entry.  Not only is this excessive, but billing for preparation of a summons of this type (Dkt. 30) is typically a non-billable activity, and billing by a senior lawyer seeking $899 per hour is particularly inappropriate.

_____

[14] Moreover, the Notice is redundant and full of grammatical and punctuation errors so, even if Mr. Friedman was billing for reviewing and revising the Notice (and not to "prepare and draft" it, as his time entry states,) not only is the time excessive, but the quality of the writing (or editing) was so poor that it should not be compensated.

d.    5.0 hours billed for preparing a Notice of Related Cases (Dkt. 7).[15] See Exhibit 8.  The Respondents had already filed a Notice of Related Cases, and, in a case of this type, one would not expect a notice of related cases to take more than an hour, let alone 5 hours.  In addition, normally this document would be prepared by a junior lawyer, not someone seeking $899 per hour.[16]

e.    1.6 hours billed for preparing a Notice of Dismissal without Prejudice (Dkt. 12), which was a simple dismissal without prejudice that justified a few tenths of an hour by a paralegal or junior lawyer at most, if it were to be billed at all. See App. A, Friedman 5/31/08 and 6/1/08 entries.

f.    2.1 hours billed for filing a Proof of Service by Mr. Carman (Dkt. 34), again something that should not have been billed at all.  App. A, 6/12/08 Friedman entry.[17]

g.    1.2 hours billed for "Review and Consider Notice of Filing Fee and related File Management."  App. A, Friedman 6/27/08 entry.  This appears to relate to a letter from the Ninth Circuit (Dkt. 50), indicating among other things that the filing fees were past due.  1.2 hours for reviewing this letter is substantially excessive, and, to the degree that "file management" refers to making sure the filing fees get paid, that would be an administrative task and not appropriately billable.[18]

_____

[15] Certain of these hours were in the state court action before the removal, but the substance of the Notice would have been the same.

[16] In addition to the excessive time, like so many of the filings in the case, it is poorly written so if he was in fact revising it, rather than drafting it (which is what his time entries indicate he was doing) the time was not well spent and should not have been billed.  Second, the Notice is not simply a notice of related cases, but an argumentative filing as to why a class action (the related case was brought as a putative class action) is not an appropriate vehicle to resolve the issues in the lawsuit.

[17] Mr. Friedman's time entry is "Review, revise, finalize and file Notice of Documents," App. A, Friedman 6/12/08 entry.  However, this document, called Notice of Documents Served by Lynn S. Carman in the Court Docket (Dkt. 34) is presumably the Proof of Service filed on 6/12/08.  It appears likely that whoever created this time entry for Mr. Friedman did so based on seeing the reference in the Docket and did not realize the document was simply a Proof of Service.

[18] "File management" frequently refers to non-billable administrative time, such as seeing to the payment of any overdue filing fees, as apparently was the case here.

h.     1.6 hours billed for "Review and Revise Notice of Decision in Superior Court Action," (Dkt. 97), which is three sentences long.  App. A, Friedman 7/30/2008 entry.

39.     All of the foregoing examples reflect unreasonable time being billed and, based on my review of the time entries and related filings, a consistent pattern of time being billed that was unreasonable, billed at too high of a rate or inappropriate to bill at all.

### III.   WORK BILLED AT EXCESSIVE RATES

40.     Another problem with the time and fees sought by the Friedman firm is that, even if Mr. Friedman, based on his experience, reputation and expertise—the factors upon which rates in a fee-shifting case are to be determined—would be entitled to the rate he is seeking for work appropriate to a senior lawyer ($899 per hour), much of the work he billed for in his time entries would not be appropriately billed at that rate (or even his "historic" or current rates) or was for work that should not have been billed at all.

41.     For example, the overwhelming amount of research that was performed in the case by the Friedman firm was undertaken by Mr. Friedman at the sought rate of $899 per hour.  See Exhibit 9.  Exhibit 9 indicates that Mr. Friedman billed approximately 80% of all the research billed and Mr. Bernardino, for whom $899 per hour is also sought, billed approximately 18% of the research time, while Mr. Watkins and Mr. Pantel, the lower-billing rate lawyers on the case billed the remaining 2%.

42.     That is exactly the opposite of how law firms that are cost-effectively managing their work handle research.  Firms that charge the types of rates the Friedman firm is seeking use much lower billing rate personnel for the bulk of the research on a case, and the billing of the research time, particularly by Mr. Friedman, significantly and unnecessarily drove up the fees sought.

43.   In addition, as discussed above, Mr. Friedman routinely billed for preparation of Notices and other filings that should have been undertaken by a more junior lawyer or billed at a junior lawyer rate.

44.   Further, Mr. Friedman billed for work that was appropriate for a paralegal.  For example, on May 11, 2008, Mr. Friedman billed 6.3 hours for "Review, Organize and Attend to Preparation of Exhibits in support of declaration in support of Motion for preliminary injunction."  See App. A, Friedman 5/11/08 entry.  Similarly, he billed for preparing schedules of declarations filed with the October 11, 2009 Motion to Enforce Preliminary Injunction.  App. A, 10/15/09, 10/16/09, and 10/18/09 Friedman entries.

45.   Mr. Bernardino similarly billed for work appropriate for a paralegal.  For example, on October 2 and 3, 2019, he billed repeatedly for organizing documents in support of his declaration regarding "fees and costs earned" in various years, presumably in support of this Motion.  See Exhibit 10, 10/2/19 and 10/3/19 entries.  Typically, organizing documents in support of a fee motion is performed by paralegals.

46.   Mr. Watkins also billed for paralegal work (organizing materials, documents, exhibits, declarations, exhibit books and files).  See, *e.g.,* Exhibit 11 hereto, 5/25/08,  6/7/08, 6/9/08, 6/14/08, 6/21/08, 6/30/08, 7/2/08, 7/12/08, 7/22/08, 7/26/08 and 9/6/08 entries.  As stated, that is paralegal work and not appropriately billed at the rate of $747 per hour being sought for his time, or at any lawyer rate.

**IV.   WORK THAT WAS INAPPROPRIATE TO BILL**

47.   As described above, in addition to billing for work at an excessive rate, Mr. Friedman billed for work that was not appropriate to bill.

48.   Mr. Watkins also billed for work that appeared inappropriate to bill.  His major role on the case was to monitor email correspondence and telephone messages for Mr. Friedman and "Continue Facilitating information for SLF [Mr. Friedman]." The overwhelming majority of his time was billed to those activities,

16

and there was typically either .5 or 1.0 hours billed.  See Exhibit 11.  It is not even clear what "facilitating information" for Mr. Friedman means.  I have never seen it used to describe legal work before.  If these time entries refer to Mr. Watkins' reviewing Mr. Friedman's email traffic and telephone calls and passing messages on to him, a lawyer is not needed for that, nor have I ever seen a lawyer being used in that role.  If Mr. Friedman needs someone to keep track of his emails and telephone messages, it would be appropriate for a non-billing person or at most a paralegal, not someone for whom $747 per hour is being sought.

## V.  QUALITY OF THE WORK PRODUCT – BILLING FOR EDITING

49.  In addition to the problems discussed above regarding the unreliability of the time entries and excessive or inappropriate time being billed, much of the final work product is poorly written.  For example, as is true for much of the written work product that I reviewed, the Memorandum of Points and Authorities filed by Petitioners in support of the Motion for Preliminary Injunction (Dkt. 11) is redundant, disorganized, and filled with grammatical, punctuation and formatting errors.  Based on the time entries and writing style, I believe that Mr. Carman drafted the Memorandum, but Mr. Friedman billed a substantial number of hours to it as well.  See Exhibit 12.  The resulting work product is such that whether Mr. Friedman was drafting it in the first instance or reviewing and revising Mr. Carman's work product, the time is substantially excessive and not appropriately compensable.

## VI.  OTHER BILLING PRACTICES

50.  Another aspect of the Friedman firm time entries that reflects on their overall accuracy are various billing practices used by the firm.

## VII. LACK OF CLARITY IN THE DESCRIPTIONS

51.  To a great degree, the Friedman firm billing practices tended to obfuscate rather than explain the work being done.

52.   The Friedman firm personnel repeatedly used the same phrases throughout the bills to describe work, but the descriptions often, as with Mr. Watkins' descriptions discussed above, did not make clear what the work was and at least at times, as also discussed above, misdescribed the work.[19]  For example, the Friedman firm had a standard billing description of "Review and Consider."  It was used thousands of times in the Friedman firm time entries.  See Exhibit 13. While that description might mean reviewing and thinking about a motion, email, or some other document, which would not necessarily be inappropriate to bill for some reasonable amount of time, it was often used for multiple hours (frequently with "consider litigation strategy" added in which adds little to the description), and one could get no sense from the time entry of what was actually being done.  Yet, over the course of the case, there were over 3300 hours billed for reviewing and considering materials.  *Id.*[20]

53.   In addition, multiple activities were frequently combined (*e.g.*, preparing, reviewing, revising, finalizing, filing, etc.), and applied to a number of documents (*e.g.*, the notice of motion, the motion, the memorandum of points and authorities, the declarations, etc.) in one entry.  As a result, it was frequently not feasible to discern what was being done with respect to which documents and therefore impossible to analyze the time for work on any specific document (in essence a form of block-billing.)  An occasional entry of this type is not a problem, but the systematic use of this approach makes it very difficult to have a sense for what work is being done with respect to what projects.

---

[19] I am cognizant of the fact that Petitioners have been deemed to have been successful in certain respects and do not mean, by remarking on the quality of their work product, to cast doubt on that determination.  However, the lodestar is based on the reasonable hours billed, and the hours billed for the written work product is excessive based on the quality of the work product alone.

[20] Exhibit 13 includes some, but not many, other tasks besides the "Review and Consider" entries, but the block-billing makes it impossible to quantify them, and the "Review and Consider" entries are the overwhelming majority of the entries.

54.   This is germane because it is generally understood that the party seeking fees has the burden of proof as to the reasonableness of the time billed and fees being sought.  It has the obligation therefore to provide adequate, clear, and explanatory information about what was being done both to establish the reasonableness of the time and fees and to allow the opponent, who is being asked to pay the fees, and the Court, that is tasked with assessing the reasonableness of the fees, to analyze the time and fees.

55.   There were certain other billing practices that had an impact on the time and fees sought by the Friedman firm as well.

## VIII.   MINIMUM BILLING AMOUNT

56.   If billers are using the minimum billing amount to bill every task, including review of every document that they see and every telephone call or conference, no matter how little time is actually spent, the practice will significantly inflate the fees over the course of a case.  In this case, it appears that the normal practice was to bill a minimum of .2 hours for reviewing any document (the description "Review and Consider" was typically used) that the biller saw regardless of how long it actually took to review the document and whether it was even appropriate to bill time for.

## IX.   COPYING OF TIME ENTRIES

57.   There are hundreds of time entries for Mr. Friedman and Mr. Bernardino conferring with each other (as well as attending the same arguments) and the time billed in those time entries is almost universally identical.  See Exhibit 14.[21] Moreover, the majority of the descriptions are identical as well (other than changing the initials of the other party to the conference).  I have never seen such a large

---

[21] Exhibit 14 is a search in the Friedman firm time entries for conferences between Mr. Friedman and Mr. Bernardino on the same day.  There are a few entries for the same activities where the time is not identical.  There are some entries where the conferences are block-billed with other activities so the time billed is not the same for the entries because of the time billed for the activities in the block-billed entry.

number and consistent pattern of identical entries of this type in any case. Based on my review of these time entries, the conclusion I have reached is that, in a very large number of the instances, the time entries of either Mr. Friedman or Mr. Bernardino were created through direct copying of the other's entries. The identical nature of the amount of time billed could have resulted from their coordinating their entries, but a significant number of the descriptions are identical in a way which makes it apparent that the descriptions were very frequently being copied as well, which calls into question the overall method by which their time entries were created.

## X.    THE RATES SOUGHT

58.    Based on my analysis of the time entries and work product, in my opinion, the rates sought by the Friedman firm are substantially excessive. I am very familiar with the rates in Los Angeles as well as the work product of lawyers in Los Angeles who are paid the rates being sought here by the Friedman firm from having reviewed the bills and work product of literally thousands of lawyers in the Los Angeles area. As indicated above, I have frequently provided expert testimony regarding the reasonableness of rates sought in litigation, including in the Los Angeles area.

59.    The work product in this case is not up to the quality of the work by lawyers in the Los Angeles area billing the rates being sought by the Friedman firm. In my opinion, the quality of the work product in this case was such that what the Mr. Friedman indicates are the Friedman firm's current rates would be inappropriately high, let alone the rates sought by the firm on this Motion. Moreover, as discussed above, a very large portion of the work in the case was billed by the two senior lawyers for work that, at firms that charge the rates being sought here, would have been undertaken by junior lawyers or paralegals, or would not have been billed at all.

60.   Thus, in my opinion, a very large reduction is required to the rates being sought to arrive at the rates that take into account both the quality and nature of the work actually done.[22]

**ADDITIONAL ANALYSES**

61.   I have been asked by Respondent's counsel to provide the following additional analyses that reflect time and fees billed in various areas.  Because of the block-billing by various of the billers, it is impossible to precisely quantify the time in these analyses because time will sometimes be included in an entry other than for the activity or project which is the subject of the particular  analysis.  However, as discussed above, that is the responsibility of the law firms since they understand the problems created by block-billing and chose to enter time in that manner anyway.  At the same time, word searches, which are the starting points for these analyses, are often under-inclusive so it is likely that there is time that should have been included in these analyses but was not, which counteracts the over-inclusive impact of the block-billing and searches.  Where we identified time entries that appeared not to belong in an analysis, we removed it.  Based on my experience, these analyses are reasonable estimates of the time and fees in the various areas being analyzed.

62.   Certain of these reports were run to apply only to discrete time periods.  Certain of the reports relating to Hooper, Lundy reflect its division of its time entries into the following three time periods, each corresponding with a separate exhibit to the Cannizzo Declaration, as identified at paragraphs 30-31 thereof:

a.     Merits period: 2008–2014 (Cannizzo Declaration, Exhibit C)

---

[22] With regard to the Hooper, Lundy rates, I note that they are seeking their historic "standard" rates, *i.e.*, what they identify as the firm's official rates during the time period in question.  It should be noted, however, that in today's litigation, a firm's standard rates are so frequently discounted (as was apparently the case here with Hooper, Lundy) that discounted rates are the norm.

b.    Fees Eligibility period: 2015–August 6, 2019 (Cannizzo Declaration, Exhibit D)[23]

c.    Fees Determination period: August 7, 2019 to October 28, 2019 (Cannizzo Declaration Exhibit E)

63.    For purposes of certain reports for Mr. Friedman, we utilized the following time periods, intended to correspond with the same separate analytic periods utilized by Hooper, Lundy, as follows:

a.    Merits period: 2008–October 21, 2014

b.    Fees Eligibility period:  October 22, 2014[24]–August 6, 2019

c.    Fees Determination period:  August 7, 2019–October 31, 2019.

64.    Attached as Exhibits 15–28 are true and correct copies of the following reports we prepared in coordination with Respondent's counsel relating to time entries and the associated fees of the Friedman firm and Hooper, Lundy:

a.    Time entries during the Merits period by the Friedman firm in date order (Exhibit 15);

b.    Time entries during the Merits period by the Friedman firm, organized by biller (Exhibit 16);

c.    Time entries during the Fee Eligibility period by the Friedman firm (Exhibit 17);

d.    Time entries during the Fee Determination period by the Friedman firm (Exhibit 18);

e.    Summary of Friedman firm fees at historical, current and "prevailing market" rates (Exhibit 19);

f.    Time entries by the Friedman firm related to the recovery of fees on a common fund theory (Exhibit 20);

_____

[23] Exhibit D to Mr. Cannizzo's declaration (Fee Eligibility Period) includes entries dating back to September 4, 2013, notwithstanding his description.
[24] Our review indicated the Friedman firm work began on this date on a motion for attorneys' fees authorized by the parties' Settlement Agreement.

g.   Time entries related to the recovery of fees billed by the Friedman firm during the Merits period other than for work related to the recovery of fees on a common fund theory (Exhibit 21);

h.   Time entries by the Friedman firm related to the Petitioners' Motion for Summary Judgment in 2010 (Exhibit 22);

i.   Time entries by the Friedman firm related to the Petitioners' Second Motion for Summary Judgment (Exhibit 23);

j.   Time entries by the Friedman firm for the Order to Show Cause re Contempt or to enforce the Preliminary Injunction (Exhibit 24);

k.   Time entries by the Friedman firm related to the settlement (Exhibit 25);

l.   Time entries by Hooper, Lundy related to the recovery of fees under a common fund or common benefit theory during the Fee Eligibility period (Cannizzo Declaration, Exhibit D) (Exhibit 26);

m.   Time entries by Hooper, Lundy related to the recovery of fees under a common fund or common benefit theory during the Merits period (Cannizzo Declaration, Exhibit C) (Exhibit 27);

n.   Time entries by Hooper, Lundy related to the recovery of fees other than under a common fund or common benefit theory during the Merits period (Cannizzo Declaration, Exhibit C) (Exhibit 28);

o.   Time entries by Hooper, Lundy related to intervention on behalf of hospitals and other trade associations after 10/1/08 (Cannizzo Declaration, Exhibit C) (Exhibit 29).

**SUMMARY**

65.   In summary, in my opinion, the lodestar sought by the Friedman firm does not reflect either the reasonable hours worked, nor the appropriate rates to apply to the work undertaken.  Based on my analysis of the time entries and file, there was substantial overbilling of particular work, work was not accurately described in the time entries, work was billed at substantially excessive rates, work

1  was billed that should not have been billed at all, the written work I reviewed was

2  of mediocre quality, and various billing practices of the firm increased the time

3  billed over that which was likely worked.  Thus, if fees are to be awarded at all, in

4  my opinion, a very substantial reduction is necessary to the hours claimed and the

5  rates sought to arrive at the appropriate lodestar for the Friedman firm.

6      I declare under penalty of perjury under the laws of the State of California that

7  the foregoing is true and correct.  Executed on December 16, 2019, at Alameda

8  County, California

9

10              _____s/*Gary Greenfield*_____

11                  Gary Greenfield

12

13  LA2008600735

14  21745571.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28